UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREA H.,                                          Case No. 2:22-cv-12515

        *Plaintiff,*                              Laurie J. Michelson
                              United States District Judge

*v.*

COMMISSIONER OF SOCIAL                               Patricia T. Morris
SECURITY,                                            United States Magistrate Judge

        *Defendant.*

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 23, 28)

## I.  RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Plaintiff Andrea H.'s Motion for Summary Judgment be **DENIED** (ECF No. 23), Defendant's Motion for Summary Judgment be **GRANTED** (ECF No. 28), and the Commissioner's final decision be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

Plaintiff's application for Disability Insurance Benefits ("DIB") was filed on April 29, 2020 (ECF No. 15-5, PageID.385), and Disabled Widow Benefits ("DWB") was filed on July 15, 2020 (*Id.* at PageID.383).  Plaintiff alleged she

1

became disabled on March 31, 2019.  (ECF No. 15-6, PageID.400).   The Commissioner denied these claims initially on December 8, 2020, and upon reconsideration on April 21, 2021.  (ECF No. 15-3, PageID.182–83; ECF No.15-4, PageID.250).  Plaintiff then requested  a hearing before an administrative law judge ("ALJ"), which took place on December 2, 2021.  (ECF No. 15-2, PageID.104; ECF No. 15-4, PageID.327).  The ALJ issued a decision on December 29, 2021, finding that Plaintiff was not disabled.  (ECF No. 15-3, PageID.218).  The Appeals Council denied reviewed on August 24, 2022.  (ECF No. 15-3, PageID.78).  Plaintiff sought judicial review on October 19, 2022.  (ECF No. 1).  The parties have filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 23, 29).[1]

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

---

[1] Plaintiff also filed a Motion for Default and Motion to Strike Answer.  (ECF No. 21).  The Undersigned issued a Report and Recommendation addressing this motion on January 2, 2024.  (ECF No. 29).

234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 3336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all

the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 15-3, 204). At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity ("SGA") since March 31, 2019. (ECF No. 15-3, PageID.210). At Step Two, the ALJ found the following impairments severe: degenerative joint disease of the left shoulder with torn rotator cuff and ulnar abutment syndrome of the left wrist. (*Id.* at PageID.210). The ALJ also noted the additional conditions Plaintiff sought treatment for such as a broken left arm, wrist, and humerus. (*Id.* at PageID.210). At Step Three, she found that none of the impairments, either independently or in combination, met or medically equal in severity or duration the criteria listing of 1.18 or 1.23. (*Id.* at 211).

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) but with additional limitations. (*Id.* at PageID.212). Plaintiff is limited to frequent use of the nondominant left upper extremity but can never reach overhead with said extremity. (*Id.* at PageID.212). At Step Four, the ALJ found that Plaintiff was capable of performing past relevant work as an assistant manager. (*Id.* at PageID.215). In the alternative, the ALJ found that there are other jobs that exist in significant numbers in the national economy which Plaintiff could also perform. (*Id.* at PageID.217). Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.218).

## E. Administrative Record

### 1. Overview of Medical Evidence

#### a. Treatment Notes

On April 1, 2019, Plaintiff was involved in a motor vehicle accident during which her vehicle slipped on black ice and proceeded into a wall. (ECF No. 15-7, PageID.515). During the accident, she fractured her left arm and wrist which limited her mobility and caused pain. (*Id.* at PageID.515, 517). Plaintiff was taken to Henry Ford following the accident where the fractures were confirmed by diagnostic imaging (i.e., X-rays) and the affected area casted. (*Id.* at PageID.525, 527). The April 1, 2019 X-ray impression indicated that Plaintiff fracture her left arm and wrist. (*Id.* at PageID.681–83). Following the accident, Plaintiff received treatment at

6

Henry Ford in the form of follow up doctor appointments, X-rays, and physical therapy.  However, she declined to undergo invasive surgery because she did not "want any metal" in her body and preferred to "go the long route with bracing and cast."  (*Id.* at PageID.781–82).

Plaintiff complained of several symptoms early in her treatment.  For example, Plaintiff's June 6, 2019 therapy progress notes indicated that she presented with pain, stiffness, and decreased range of motion.  (*Id.* at PageID.601).  Further, the progress notes indicated that Plaintiff's activities of daily living ("ADL") were severely limited.  (*Id.* at PageID.603).  She reported having difficulty getting dressed and holding items in her left hand.  (*Id.* at PageID.599).  The overall clinical impression was that Plaintiff presented with "complex problems" in her left arm due to the fractures, which had been stabilized in a cast for approximately eight weeks, but would do well by participating in physical therapy for her shoulder, hand, and wrist.  (*Id.* at PageID.605).  Her June 2019 X-Ray impressions indicated incomplete healing of the fractures.  (*Id.* at PageID.661).

Plaintiff's June, July, and August 2019 Henry Ford physical therapy progress notes generally report that she was experiencing progress with her rehabilitation. (*Id.* at PageID.574–99).  Despite a few difficult days, her August and September 2019 therapy notes indicate the same.  (*Id.* at PageID.554–74).

7

Her October 2019 physical therapy progress notes demonstrate positive progress and diminished pain. Specifically, her October 3, 2019 Henry Ford progress notes indicated positive progress with a plan to (i) continue with nonoperative treatment, (ii) remove the previous lifting restriction no lifting restriction, (iii) prohibit overhead lifting and lifting of items weighing more than five pounds at work, and (iv) return in a few months for a follow-up X-ray of her left humerus and wrist. (*Id.* at PageID.551). Notably the progress notes indicate Plaintiff was doing well, her pain had further diminished, and she was pleased with the results of treatment so far. (*Id.* at PageID.810). However, a few days later Plaintiff reported a new tightness in her hand and was not sure of the source. (*Id.* at PageID.546). Overall, her October 2019 physical therapy notes indicated positive progress including reduction in pain, and gradual increase in range of motion. (*Id.* at PageID.548–52).

Plaintiff's November 5, 2019 progress notes indicated Dr. William Hakeos observed that her fracture healed routinely, but she was suffering from left shoulder pain, with an unspecified chronicity. (*Id.* at PageID.541). And while Plaintiff reported difficulty placing her arm behind her back, she also reported her pain level to vary between three and five on a 10-point scale. (*Id.*). Further, the notes show increased functionality, and ability to use her left hand for basic ADL including lifting a gallon of milk with her left hand. (*Id.* at PageID.543). The assessment

indicated that after completing 24 therapy sessions, Plaintiff reported decrease in wrist pain, and improvement in range of motion and strength. (*Id.*).

During her December 19, 2019 appointment, Plaintiff stated that her pain was limited, and she did not need any further pain medications. (*Id.* at PageID.539). She did complain of a soft tissue contracture on her left hand and advised that her physical therapist referred her to an orthopedic surgeon to evaluate the issue. (*Id.* at PageID.539). Dr. Jildeh also reviewed the X-ray images, and observed that the fracture had healed. (*Id.* at PageID.540). There was no significant soft tissue swelling and no new fracture or dislocation. (*Id.* at PageID.631–32). The notes reflect the proposed treatment plan was for Plaintiff (i) to put full weight on her arm, (ii) to take over the counter medication as needed, (iii) to see a hand surgeon to evaluate her Dupuytren's contracture, and (iv) to schedule a return visit in three months for follow up X-rays. (*Id.* at PageID.540). She was also issued a work note. (*Id.*).

In March 2020, Plaintiff requested an updated work note which included the date of her next office visit and a direction to continue her current restrictions. (*Id.* at PageID.538). The  updated work note was issued along with a request from Dr. Hakeos to see her in four weeks. (*Id.*). In May 2020, Plaintiff requested an extension on her work note to reflect her updated follow up appointment in July 2020 but Dr. Hakeos was unable to extend her work note any further as she had to be seen before

a new note would be issued.  (*Id.* at PageID.1071–72).  The call notes indicates that her follow up appointment "ha[d] been cancelled and rescheduled multiple times and patient ha[d] not been seen since December."  (*Id.*).

Next, her June 18, 2020 Henry Ford progress notes indicate she reported mild pain at night when laying on her side, experiencing a pain and snapping sensation over her ulna, loss of motion, weakness of her upper arm, and inability to lift her left arm over her head.  (*Id.* at PageID.824).  Despite these challenges she was able to perform the following ADLs – eating, personal care, grooming, hygiene and dressing her upper body.  (*Id.*).  She also indicated she was not taking any pain medications, and had returned to work.  (*Id.*).  Plaintiff's June 18, 2020 X-rays showed complete healing of the distal radius fracture but incomplete healing of the humeral shaft fracture.  (*Id.* at PageID.1073).  The notes indicate that she was also suffering from Dupuytren's contracture of the left hand, and ulnar abutment syndrome of the left wrist.  (*Id.* at PageID.1074).  Further, she reported experiencing mild pain at night when laying on her side.  (*Id.* at PageID.1070).  She also reported feeling a snapping sensation over her ulna, loss of motion and weakness in her upper arm, and inability to lift her arm over her head.  (*Id.*).  Despite these limitations, she "[i]s able to perform the following activities: eating, personal cares, grooming, hygiene and dressing [her] upper body."  (*Id.*).  Plaintiff was still not taking any prescribed pain medication, was referred to a hand surgeon for evaluation of Dupuytren's

10

contracture and ulnar abutment syndrome, was permitted to return to work without restrictions, and advised to return for a follow up X-ray in three months. (*Id.*). The report indicates that she in fact had returned to work. (*Id.*). In July 2020, the Henry Ford progress notes state that Plaintiff's "[l]ast office note and previous work note [was] faxed to Lincoln Financial [and she] was returned to work on 4/23/20 with restrictions, and no restrictions as of June 1, 2020." (*Id.* at PageID.1069).

Plaintiff's October 28, 2020 progress notes indicate that she had been experiencing (i) difficulty with the range of motion on her left shoulder since her cast removal, (ii) difficulty reaching above her head although she was able to comb her hair, (iii) pain near the AC joint as well as the proximal portion of the humerus, and (iv) minimal improvement in the shoulder pain from physical therapy. (*Id.* at PageID.945). The October 20, 2020 X-ray images were reviewed and showed a "[s]table left AC joint separation," "[r]otator cuff tendinopathy with superior migration of the humeral head consistent with chronic rotator cuff tear," and "[h]ealed fracture of the proximal diaphysis of the left humerus." (*Id.* at PageID.947). She also experienced left shoulder stiffness which was consistent with frozen shoulder syndrome, and her X-ray findings were significant for "probable chronic rotator cuff tear and historical traumatic AC joint separation with fracture of the distal clavicle managed nonoperatively." (*Id.*).

Plaintiff's December 8, 2020 Henry Ford Detroit Piston Performance Center progress notes indicate that she visited the center for chronic pain in her left shoulder and that the pain is exacerbated with any attempts at overhead activity. (*Id.* at PageID.1060). The assessment was that Plaintiff suffered from chronic left shoulder pain secondary to chronic rotator cuff tear and rotator cuff arthropathy, and her history of left humeral shaft fracture and left distal radius fracture had both healed. (*Id.*).

### b. State Agency Medical Consultants Reports

### 1. Dr. Twaide Langham, D.O.

Dr. Twaide Langham, D.O. reviewed Plaintiff's file and issued a consultant report regarding her condition on November 22, 2020. In the report, Plaintiff's main condition is identified as pain and Dr. Langham found that one or more of her medically determinable impairments can reasonably be expected to produce the pains or symptoms. (ECF No. 15-3, PageID.162). However, her statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. (*Id.* at PageID.162). Considering the totality of the medical and non-medical evidence, Dr. Langham found Plaintiff's statements regarding her symptoms to be partially consistent. (*Id.* at PageID.162). He found that she could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour

workday, sit for about 6 hours in an 8-hour workday, push and/or pull with no limitations, other than shown for lift and/or carry, and no postural limitations, (*Id.* at PageID.163–64). However, he noted Plaintiff would have manipulative limitations which entailed of limited left overhead reaching but no limitations as to handling, fingering, and feeling, and no visual, communicative or environmental limitations. (*Id.* at PageID.164–65).[2]

## 2. Dr. Thomas Flake, Jr., M.D.

Dr. Thomas Flake, Jr., MD. also reviewed Plaintiff's file and arrived at the same conclusions as Dr. Langham on April 29, 2021. (ECF No. 15-3, PageID.192). He found Plaintiff has exertional limitations, can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, no limitations on push and/or pull in upper and lower extremities, stand and/or walk (with normal breaks) for about 6 hours in an 8 hour workday, sit (with normal breaks) for a total of about 6 hours in

---

[2] Dr. Langham's ultimate findings were: "After reviewing all the evidence in the file, the clmts statements and are partially consistent. The clmts impairments are severe and persistence, but the effect is not fully supported. Imaging shows fracture left distal radius and L humerus fracture are healed. The record does not show any examination findings which would support significant functional limitations whereas the clmt would not be able to sustain Light work. Light RFCA considers clmt allegations of pain which could be reasonable. The medical evidence in file does not establish a condition that meets or equals a listing. Light RFCA Lift/carry 20/10# occasionally/frequently; stand/walk 6 of 8 hours/days; sit 6 of 8 hours/day workday; unlimited push/pull. Occasionally overhead reaching L shoulder, no visual or communicative limitations, no environmental hazards." (ECF No. 15-3, PageID.165).

an 8 hour workday, no postural limitations, and no limitations in reaching in front and/or laterally of her body. (ECF No. 15-3, PageID.191–92). Further, there are no limitations on fingering, feeling, visual, communicative, or environmental. (*See id.*) However, she does have manipulative limitations in the sense that she is limited in reaching overhead with her left upper extremity. (*See id.*)

Dr. Flake's additional explanation states that "[a]fter reviewing the ME in file and the assessment presented above, it would appear that the prior evaluation [(i.e., Dr. Langham's)] adequately reflects the claimant's ability to perform work-related activities. Therefore, the previous determination is affirmed." (ECF No. 15-3, PageID.192–93).

### c. Plaintiff's Function Report

In her function report, Plaintiff indicated that she was not able to lift over 10 pounds or under with her left arm due to her injury and the constant pain in her wrist especially when it is raining. (ECF No. 15-6, PageID.409). She represented that while her father helps her with a number of tasks, occasionally she is able to prepare her own meals (e.g., oatmeal, tuna sandwich, fish, etc.), she does laundry twice a week, watches television, drives herself around using her right arm, and goes grocery shopping, but not much else. (ECF No. 15-6, PageID.410–11, 412). As to personal care, Plaintiff is unable to pull her pants up, wash the back side of her body, or style her hair aside from pulling it into a bun. (*Id.* at PageID.411). She is also able to pay

her bills and count her change. (*Id.* at PageID.412). The pain is so bad that she cannot lay on her side at night and spends the nights toss and turning. (*Id.* at PageID.411).

Next, Plaintiff stated that the injury, and the COVID pandemic,[3] affected her ability to lift, reach, and hand usage in general. Her memory, concentration, understanding, and ability to get along with others was also affected. (*Id.* at PageID.414). However, she also represents that she believes she can "pay attention" all day, follow written instructions well, and fare with authority figures well, but does not handle stress well. (*Id.* at PageID.414–15).

Plaintiff has a brace, which was prescribed following her injury, but only occasionally wears it as it hurts her wrists. (*Id.* at PageID.415). She is currently talking Motrin/Ibuprofen for her pain. (*Id.* at PageID.416).

### 2. Overview of Hearing Testimony

#### a. Plaintiff's Testimony

On March 31, 2019, Plaintiff was involved in a car accident when her vehicle slipped on black ice and proceeded into a wall. (ECF No. 15-2, PageID.113). As a

---

[3] Plaintiff's response does not differentiate between how the COVID pandemic and her injury affected her. So in the interest of completeness, the undersigned includes a reference to the pandemic in this section, however Plaintiff's mental capacity was neither addressed in the RFC nor raised in Plaintiff's complaint or motion.

result of the accident, she broke her ulna[4] and humerus[5], tore her rotator cuff, and developed severe tendinosis in her shoulder.  (*Id.*).

Plaintiff provided a detailed overview of her employment history.

- In 2006, she worked at Walgreens as an assistant store manager where she opened up stores, hired, trained, and fired new employees, and unloaded delivery trucks.  (*Id.* at PageID.128).

- Next, she worked at Big Lots where she worked in a similar managerial capacity and her responsibilities included opening stores, unloading trucks, and personnel recruitment and onboarding.  (*Id.* at PageID.131).

- Then, she worked at Sky Chefs where she washed, loaded and unloaded dinnerware from a conveyor belt before it was transported to the food department prior to being loaded onto the plane.  (*Id.* at PageID.129–30).

- She also worked at Mastronardi Produce as an administrative line lead where she printed labels, graded the vegetables, and unloaded them.  (*Id.* at PageID.131–32).

---

[4] The ulna is the bone on the little-finger side of the human forearm.  Merriam-Webster.com, https://merriam-webster.com/dictionary/ulna (last accessed Jan. 17, 2024).

[5] The humerus is the long bone of the upper arm or forelimb extending from the shoulder to the elbow.  Merriam-Webster.com, https://merriam-webster.com/dictionary/ulna (last accessed Jan. 17, 2024).

- From 2016 to 2017, she worked at Enviro-Clean for about six months from where she was an assistant manager and oversaw several buildings, oversaw the custodians, and cleaned some of the buildings.  (*Id.* at PageID.132).

- Finally, she moved on to Syncreon[6] where she was employed in April 2019. Her responsibility was to audit motor vehicle parts.  (*Id.* at PageID.112–13). She had two and half years of seniority at this position.  (*Id.* at pageID.113). Her last day at the job was March 31, 2019, the day of her accident.  (*Id.*).

Her employer at the time would not permit her to return to work while the doctors were diagnosing the issue with her arm.  (*Id.* at PageID.126).

In August 2020, Plaintiff's doctor[7] informed her that there were no longer any lifting restrictions for her left arm.  (*Id.* at PageID.136).  And she was permitted to lift as much weight as she could tolerate.  (*See id.*).  However, she testified that since the date of the accident, although her doctor cleared her to return to work with a weight restriction, she has not returned due to the pain in her wrist.  (*Id.* at PageID.114, 120, 135–36).  She also testified that she does not believe she would be able to obtain future employment because she does not see herself being able to direct people or sit in one position due to the ongoing pain she experiences, and because she is unable to use her left arm.  (*Id.* at PageID.125–26).

---

[6] She was also working at Randstad during this time.  (ECF No. 15-2, PageID.135).

[7] Plaintiff has only received care from Henry Ford Hospital, in Detroit, for her injuries and continues to be treated there periodically.  (*Id.* at PageID.118).

Due to the pain in her left side, she is now overcompensating and relying on her right side which has led to her experiencing pain in her right arm as well. (*Id.* at PageID.115–16). She also has difficulty getting on a regular sleep schedule, putting on the left side of her slacks and shirts, and typing. (*Id.* at PageID.115, 117, 122, 150). While she makes attempts, she is not able to lift much with her left hand due to her wrist and also has issues reaching. (*Id.* at PageID.119, 124). Periodically (e.g., every three days or so) she will wear a brace but the pain in her wrist prevents her from doing so on a regular basis. (*Id.* at PageID.120). She testified that she did not want to take opioids or have steroids injected into her body for fear of becoming reliant or addicted to the medication but admitted that she does not believe the medication she takes now is subduing the pain. (*Id.* at PageID.117, 137).

Plaintiff lives with her 78-year-old father who assists her with almost everything on a daily basis. (*Id.* at PageID.120–21). He assists with opening food items (e.g., cans), dressing, grooming (e.g., brushing her hair), grocery shopping, cooking, and bathing. (*Id.* at PageID.121–22). He has been assisting her with these tasks since she got into her accident, and spends on average six to eight hours a day helping her. (*Id.* at PageID.121).

### b. Vocational Expert's Testimony

Charlotta Ewers, Vocational Expert ("VE"), testified during Plaintiff's hearing. She testified that Plaintiff's previous positions qualified as follows:

- Supervisor at janitorial services had the DOT code of 381.137-100, with an SVP of 6, skilled, at the medium duty range, and performed at medium.

- Kitchen food assembler had the DOT code of 319.484-010, with an SVP of 3, semi-skilled, at the light duty range, and performed at the medium level.

- Produce grader had the DOT code of 409.687-010, with an SVP of 2, unskilled, at the medium duty range, and performed at medium.

- Warehouse worker had the DOT code of 922.687-058, with an SVP of 2, unskilled, at the medium duty range, and according to the record the job was performed at the heavy level.

- Assistant manager had the DOT code of 189.167-018, with an SVP of 6, skilled, at the light duty range, and according to the record the job was performed at the medium level.

(ECF No. 15-2, PageID.139–40).  The VE testified that the skills from the jobs as they were performed that would transfer to other jobs were "[r]ecordkeeping, report writing, scheduling, ordering, payroll, inventorying, keyboarding, operation of office equipment and lastly supervisory skills to delegate authority."  (*Id.* at PageID.141).

        After collecting this information from the VE, the ALJ presented the VE with hypotheticals.  The ALJ posited the following:

> [A]ssume we have someone like our claimant . . . who
> would be the same age[] as our claimant, have the same
> education and the same past work experience.  Let's say
> our hypothetical person is able to engage in the full range
> of a light exertional job but she is limited to only
> frequently using her left upper extremity, that's her
> nondominant for activities however she's not able to do
> any [overhead] reaching with that hand, that arm or hand,
> upper extremity.   Do you believe that person could
> perform any of these past jobs that are relevant to our
> discussion today either as performed by our claimant or as
> they're generally performed in the national economy?

(*Id.* at PageID.141–42).  The VE testified that the following positions would be eliminated: housekeeping supervisor due to overhead lifting, kitchen assembler because even though it was performed at light it included overhead lifting, warehouse worker, and produce grader.  (*Id.* at PageID.142).  The only job that remained was assistant manager as generally performed because it was performed at a medium duty range.  (*Id.*).  This position "could not be done as performed by the claimant but as written by the DOT."  (*Id.*).  And that none of the jobs could be performed in a sedentary capacity.  (*Id.* at PageID.143).

The ALJ then asked if there were any other jobs that Plaintiff's skills could be transferred to that were sedentary.  (*Id.*).  The VE identified the following: order clerk, DOT of 249.362-026, sedentary, semi-skilled, an SVP of 4, and approximately 50,000 position available nationally; personnel clerk, DOT 209.362-026, sedentary, semi-skilled, an SVP of 4, and approximately 75,000 positions available nationally; and payroll clerk, DOT 215.382-014, sedentary, semi-skilled, an SVP of 4,

approximately 75,000 positions available nationally. (*Id.*). The skills that would transfer to those positions are recordkeeping, report writing, scheduling, ordering, and payroll; inventory and supervisory skills would not be transferrable. (*Id.* at PageID.143–44).

Next, the ALJ added the posed the following question: "frequently using the right upper extremity, the dominant hand would that impact the ability to do any of the jobs, the past work of assistant manager or these other sedentary jobs." (*Id.* at PageID.144). The VE confirmed it would not. (*Id.*). Next, the ALJ asked what would happen to the work pool if the use of that nondominant left upper extremity was further reduced to occasional. (*Id.* at PageID.145). The VE responded that "[b]ecause they are in the clerical industry it's my vocational opinion [the use of the nondominant hand] need[s] to be at frequent, therefore I would not be able to identify transferability." (*Id.*). And the VE was unable to identify any light jobs that the skills would transfer to that could be done with the overhead reach limitation. (*Id.*). But the VE testified that the unskilled light jobs that could be performed with that limitation are as follows: office mail clerk, DOT 209.687-026, light duty range, unskilled, with an SVP of 2, approximately 50,000 jobs available nationally; copy machine operator, DOT 207.685-014, light duty range, unskilled, with an SVP of 2, approximately 45,000 jobs available nationally; office helper, DOT 239.567-010,

21

light duty range, unskilled, with an SVP of 2, approximately 70,000 jobs available nationally. (*Id.*).

Next, the ALJ asked what would happen if they eliminated "any work with that left upper extremity," would the hypothetical person be able to perform the light jobs? (*Id.* at pageID.146). The VE testified it would impact those jobs as well. (*Id.*). The ALJ next asked if the hypothetical person were permitted to take 15-minute breaks every hour, how would that affect their ability to perform these light jobs. (*Id.* at PageID.147). The VE responded it would be difficult to identify competitive employment because the hypothetical person would be off task more than ten percent of the day. (*Id.* at PageID.148). And if the same person needed to be absent twice a month on a recurring basis, the VE testified that would eliminate any opportunity for competitive employment. (*Id.*).

The VE confirmed that most of her testimony was consistent with the Dictionary of Occupational Titles and its companion the Selected Characteristics of Occupations. (*Id.* at PageID.148). Her testimony regarding (i) reaching was not based on the DOT as the DOT is silent on "specific right versus left hand reaching," (ii) transferability of Plaintiff's skills, (iii) absenteeism, (iv) off task behavior, and (v) discussions regarding generalized fast-paced work environment, and instead she relied on her education, training, and placement history. (*Id.* at PageID.148).

### F.  Governing Law

22

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)   Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or

> hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;
>
> (6)    Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];
>
> (7)    Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or
>
> (8)    Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

24

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

25

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other factors that "tend to support or contradict a medical opinion or prior administrative

26

medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this

section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

 (i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

 (ii) Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

 (iii) Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

 (iv) Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504.   Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.*   The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f).   Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*   Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques.   Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g.,

30

abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other

symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms."  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may

affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)    Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this

treatment is expected to restore your ability to work." *Id.*, § 404.1530(a).  Stated

differently, "[i]f you do not follow the prescribed treatment without a good reason,

we will not find you disabled or, if you are already receiving benefits, we will stop

paying you benefits." *Id.*, § 404.1530(b).  Acceptable (or "good") reasons for failure

to follow prescribed treatment include:

(1)   The specific medical treatment is contrary to the established teaching and tenets of your religion;

(2)   The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)   Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)   The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)   The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

## G.  Argument and Analysis

In sum, Plaintiff's summary judgment requests that the Court grant the relief

sought in her complaint.  The complaint calls for the ALJ's ruling to be found

incorrect due to (i) the lack of records received by Plaintiff despite her repeated

requests, (ii) the ALJ's failure to fulfill her alleged responsibility to investigate the

facts, and develop the evidence supporting and opposing Plaintiff's case (i.e., follow up with Plaintiff's physician to investigate why she was released with no restrictions despite the subsequent scheduled sports specialist doctors' appointments), and (iii) the ALJ improperly found the Henry Ford Hospital sports specialist doctors' opinions not credible.  (ECF No. 9, PageID.34–38).  The Commissioner contends that substantial evidence supports the ALJ's findings and thus Plaintiff's motion should be denied.

### 1. Plaintiff's Complaint About the Court's and Agency's Processes Are Without Merit

The Commissioner contends that Plaintiff's arguments regarding the fact that (i) the answer did not respond to her original complaint, (ii) each attorney who filed a notice of appearance did not provide a separate answer, and (iii) the answer was originally mailed to the incorrect address are all meritless.  (ECF No. 28, PageID.1490).  The Commissioner asks the Court to review their responses to Plaintiff's Motion to Strike Answer and Motion for Default Judgment.  (*Id.* at PageID.1491).

The Court addressed these issues in its January 2, 2024 Order (ECF No. 29) and recommended rejecting these arguments as (i) Defendant filed a timely answer, (ii) Plaintiff had not alleged any claim or right to relief, or offered any evidence to support such a claim against the party she sought default against, and (iii) the parties who Plaintiff alleges did not file an answer were not required to do so as they were

the attorneys in the matter.  (*Id.* at PageID.1512, 1514).  Thus, the Undersigned recommended the Court deny Plaintiff's motion for default and motion to strike the answer.  (*Id.* at PageID.1514).  Nothing in Plaintiff's summary judgment motion sways or convinces the Undersigned to reconsider or alter the position taken, and thus she stands by her previous recommendation.

## 2.  The ALJ's Decision is Supported by Substantial Evidence

Plaintiff's motion does not challenge whether the ALJ's decision is supported by substantial evidence.  She merely challenges the ultimate unfavorable ruling.  A disagreement with an unfavorable decision is not a basis upon which a district court may grant summary judgment in a party's favor.  *Gregory v. Comm'r of Soc. Sec.*, No. 1:21-cv-585, 2022 WL 2900887, at *6 (W.D. Mich. July 22, 2022) ("In short, although Plaintiff contends that the ALJ reached the wrong result, her mere disagreement with the ALJ's conclusion is not enough to overcome substantial evidence, which supports the ALJ's decision."); *Fulghum v. Comm'r of Soc. Sec.*, No. 15-13894, 2016 WL 7670614, at *7 (E.D. Mich. Nov. 21, 2016) ("[Plaintiff's] mere disagreement with the ALJ's evaluation of the evidence does not establish error warranting remand."); *Buntin v. Kijakazi*, No. 20-13388, 2022 WL 18107310, at *6 (E.D. Mich. June 10, 2022) ("Even if this Court might have weight his opinion differently, mere disagreement is insufficient to discard the ALJ's findings").

Furthermore, the ALJ's decision is supported by substantial evidence contained in the record. As demonstrated by her record, Plaintiff elected to treat her fracture non-operatively and at the beginning of her treatment course she presented with "pain, stiffness, decreased range of motion and strength left hand/wrist consistent with healing distal radius fracture" during her physical therapy sessions (ECF No. 15-7, PageID.601, June 6, 2019 Progress Note). And these symptoms made it difficult for Plaintiff to perform ADL. (*Id.* at PageID.603).

Plaintiff's June to September 2019 Henry Ford physical therapy progress notes generally report that she was experiencing progress with her rehabilitation. (*Id.* at PageID.554–99). Her October 2019 physical therapy progress notes demonstrate positive progress and diminishment in pain. Specifically, her October 3, 2019 notes indicated positive progress with a plan to (i) continue with nonoperative treatment, (ii) remove the lifting restriction, (iii) continue with the work restriction prohibiting overhead lifting and lifting of items weighing more than five pounds, and (iv) return in a few months for a follow-up X-ray of her left humerus and wrist. (*Id.* at PageID.551). Notably the progress notes indicate Plaintiff was "[d]oing well, pleased with the outcome thus far [and] [p]ain improved." (*Id.* at PageID.810). A few days later Plaintiff reported a new tightness in her hand and was not certain of the source. (*Id.* at PageID.546). But overall her October 2019

37

physical therapy notes indicated positive progress in recovery including reduction in pain, and gradual increase in range of motion.  (*Id.* at PageID.548–52).

By November 2019, Dr. Hakeos observed that Plaintiff's fracture healed routinely although she was suffering from left shoulder pain, with an unspecified chronicity.  (*Id.* at PageID.541).  While she reported difficulty placing her arm behind her back, she also reported her pain level to vary between three and five on a 10-point scale. (*Id.*).  Further, she demonstrated increased functionality, and ability to use her left hand for basic ADL including lifting a gallon of milk with her left hand.  (*Id.* at PageID.543).  Overall, the assessment indicated that after completing 24 therapy sessions, Plaintiff reported decrease in wrist pain, and improvement in range of motion and strength.  (*Id.*).

By December 2019, Plaintiff's pain was limited, and she did not need any further pain medications.  (*Id.* at PageID.539).  She complained of a soft tissue contracture on her left hand and advised that her physical therapist referred her to an orthopedic surgeon to evaluate the issue.  (*Id.* at PageID.539).  The proposed treatment plan was for Plaintiff to (i) put full weight on her arm, (ii) take over the counter medication as needed, (iii) see a hand surgeon to evaluate her Dupuytren's contracture, and (iv) schedule a return visit in three months for follow up X-rays. (*Id.* at PageID.540).  She was also issued a work note.  (*Id.*).

In March 2020, Plaintiff received an updated work note with a direction to continue her current restrictions. (*Id.* at PageID.538). But the record indicates she did not undergo another X-ray or see Dr. Hakeos again until June 2020. (*Id.* at PageID.538. By June 2020, Plaintiff reported experiencing mild pain at night when laying on her side, experiencing a pain and snapping sensation over her ulna, loss of motion, weakness of her upper arm, and inability to lift her left arm over her head. (*Id.* at PageID.824, June 18, 2019 Progress Note). And yet, despite these challenges she was able to perform the following ADLs: eating, personal care, grooming, hygiene and dressing her upper body. (*Id.*). Further, she was not taking any pain medications, and reported having already returned to work. (*Id.*). Her June 18, 2020 X-rays showed complete healing of the distal radius fracture but incomplete healing of the humeral shaft fracture. (*Id.* at PageID.1073). The notes indicate that she was also suffering from Dupuytren's contracture of the left hand, and ulnar abutment syndrome of the left wrist. (*Id.* at PageID.1074). Further, she reported experiencing mild pain at night when laying on her side. (*Id.* at PageID.1070). She also reported feeling a snapping sensation over her ulna, loss of motion and weakness in her upper arm, and inability to lift her arm over her head. (*Id.*). Despite these limitations, she was "able to perform the following activities: eating, personal cares, grooming, hygiene and dressing [her] upper body." (*Id.*). At this point, she was still not taking any prescribed pain medication, was referred to a hand surgeon for evaluation of

Dupuytren's contracture and ulnar abutment syndrome, was permitted to return to work without restrictions, and advised to return for a follow up X-ray in three months. (*Id.*). And this report also stated that she in fact had returned to work. (*Id.*). Importantly, the progress notes state that Plaintiff's last office note and previous progress notes were issue and she was returned to work on April 23, 2020 with restrictions, and no restrictions as of June 1, 2020. (*Id.* at PageID.1069).

Plaintiff's October and December 2020 progress notes indicate that she was experiencing difficulty with the range of motion in her left shoulder, difficulty reaching above her head, shoulder pain, and shoulder stiffness and had a chronic rotator cuff tear and rotator cuff arthropathy (*Id.* at PageID.945, 1060).

This background shows that Plaintiff's progress over her treatment course supports the ALJ's finding that she was not disabled. Further, Plaintiff offers no support, as little exists in the record, to support the contention that the ALJ's decision is not supported by substantial evidence and remand is warranted. Plaintiff's argument amounts to nothing more than a disagreement with the ALJ's ultimate finding. *Gregory*, 2022 WL 2900887 at *6; *Fulghum*, 2016 WL 7670614 at *7; *Buntin*, 2022 WL 18107310 at *6. This is not a basis for remand. *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (The district court's review is restricted solely to determining whether the "Commissioner has failed to

apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record.") (internal quotation marks omitted).

Plaintiff also makes a passing reference to the ALJ's decision to leave out "very important facts in [her] testimony." (ECF No. 9, PageID.38). But does not further elaborate on this point and does nothing more than raise this argument in a cursory fashion, and while the undersigned is empathetic to Plaintiff's position as a *pro se* litigant, this does not relieve her of her duty to carry the argument. *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246, at *3 (E.D. Mich. July 21, 2017) (internal quotations marks omitted); *Berry v. Comm'r Soc. Sec.*, No. 16-10548, 2016 WL 7664225, at *11 (E.D. Mich. Dec. 8, 2016) (holding that a plaintiff waived his argument that "the ALJ could have included more restrictive limitations in his RFC assessment" by not specifying what "restrictions might be appropriate").

Plaintiff also alludes to the point that the ALJ should have contacted her physician for further information regarding her lack of restrictions but again provides no further explanation. (ECF No. 9, PageID.37). Plaintiff is correct that an ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000). The ALJ is obligated "to fully develop the record," *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 397 (6th Cir. 2010), and bears "the ultimate responsibility for ensuring that every claimant receives a full and fair hearing," *Lashley v. Sec'y of Health &*

*Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) (citing *Richardson v. Perales*, 402 U.S. 389 (1971)); *see Longnecker v. Comm'r of Soc. Sec.*, No. 15-11705, 2016 WL 3912859, at *6 (E.D. Mich. May 25, 2016), report and recommendation adopted, 2016 WL 3903192 (E.D. Mich. July 19, 2016).  An ALJ is required to "develop [a claimant's complete medical history" and to "make every reasonable effort to help [the claimant] get medical reports from [the claimant's] medical sources." 20 C.F.R. § 404.1512(d); *see Sutton v. Comm'r of Soc. Sec.*, No. 12-11043, 2013 WL 1122877, at *2 (E.D. Mich. Mar. 18, 2013).

Courts determine whether this duty is satisfied on a case-by-case basis. *Osburn v. Apfel*, 182 F.3d 918, at *7 (6th Cir. July 9, 1999).  "Failure by an ALJ to fully develop the factual record in a particular matter is often evidenced by superficial or perfunctory questioning, as well as a failure to obtain all available medical records and documentation."  *Vaca v. Comm'r of Soc. Sec.*, 2010 WL 821656, at *6 (W.D. Mich. Mar. 4, 2010).  "An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing."  *Figard v. Comm'r of Soc. Sec.*, 2010 WL 3891211, at *7 (W.D. Mich. July 1, 2010) (quoting *Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996)); *see also Longnecker*, 2016 WL 3912859, at *7.

First, Plaintiff was represented by counsel during the hearing who stated during the hearing that the record was complete and did not request that the record

be left open for supplemental examinations or medical materials, so it is not clear why the ALJ would be under the impression that further medical records or investigation would be necessary.  (ECF No. 15-2, PageID.110); *see Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986) ("[T]he hearing officer is under no heightened duty to develop the record when a claimant is represented by counsel.").  Next, read plainly, Plaintiff's argument is that she disagrees with her physician's findings.  The treatment notes indicate that her physician found she no longer needed work restrictions and communicated as much in her work note.  (ECF No. 15-7, PageID.1070–74).  On its face, the medical record was clear and definitive, thus further follow up by the ALJ was neither required nor necessary given the lack of ambiguity in the treatment notes.  *Compare D'Angelo v. Comm'r of Soc. Sec.*, 475 F. Supp. 2d 716, 722 (W.D. Mich. 2007) (holding that the ALJ failed to sufficiently develop the record in light of the fact that plaintiff was unrepresented and the administrative record included practically no medical records of plaintiff's treatment with his physician).

As unfortunate as Plaintiff's circumstances are, the Undersigned finds that the ALJ's decision is supported by substantial evidence and thus recommends denying Plaintiff's Motion for Summary Judgment.

### 3.  The ALJ Properly Evaluated the Medical Progress Notes

Although Plaintiff argues that the ALJ improperly found the Henry Ford Hospital sports specialist doctors' opinions not credible, she fails to indicate which doctors, what opinions, or at least where in the ALJ's decision this finding was made. Regardless, the ALJ's decision provided a clear rational for finding the opinions proffered by the Henry Ford professionals not persuasive.

A close review of the decision demonstrates that the ALJ found the short-term limitations (e.g., avoid lifting more than five pounds or avoid lifting more than a gallon of milk with her left arm) prescribed by the Henry Ford medical professionals ("HFMP") during the early period of Plaintiff's recovery ultimately not persuasive because they were overridden by postdated prescriptions dictating that Plaintiff "could return to work without any restrictions." (ECF No. 15-3, PageID.215). The ALJ's decision and the medical record demonstrate that around late 2019 to mid-2020 Plaintiff's condition was improving with the help of therapy, and the pain she was experiencing was either subsiding or remaining consistent. (ECF No. 15-7, PageID.554–99, 1069–70, 1073–74). Thus, the ALJ's decision to find the 2019 progress notes which recommended returning to work with restrictions not persuasive is supported by overall record. Despite this all clear issued by Dr. Hakeos in June 2020 "finding that the [Plaintiff's] impairments [were] not as limiting as alleged," the ALJ found that those statements were not persuasive and instead "elected to view the evidence [(i.e. the entire record including Plaintiff's testimony)]

44

in the light **most favorable to Plaintiff**," ultimately finding that she was limited "to a reduced range of light work activity with the left upper extremity. . . ." (*Id.; see also* ECF No. 15-2, PageID.114–17, 119, 120, 124–26, 135–36).[8]  Last, Plaintiff does not identify any notes which override Dr. Hakeos's June 2020 progress note that she may return to work with no restrictions.

### H.  Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 23), **GRANTING** the Commissioner's motion, (ECF No. 28), and **AFFIRMING** the Commissioner's final decision.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1.) Failure to file specific objections constitutes a waiver of any further right

---

[8] If the undesigned were to find Plaintiff's argument persuasive and in turn find that the ALJ should have decided that the Henry Ford medical professionals' opinions were persuasive, this evidence could be used to support a finding of not disabled with no limitations which would be an even more unfavorable ruling for Plaintiff.

of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 22, 2024

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge